IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS

JANE DOE,

     Plaintiff,

v.                                  Docket No. _____

THE UNIVERSITY OF MEMPHIS.        JURY DEMAND

     Defendant.

## COMPLAINT FOR VIOLATION OF TITLE IX OF THE CIVIL RIGHTS ACT OF 1964

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSE AT MEMPHIS:

     COMES NOW Jane Doe (hereinafter "Plaintiff" or "Doe") and for her causes of action against The University of Memphis (hereinafter "U of M," "Defendants" or "The University") respectfully states as follows:

     1.      Plaintiff is an adult resident citizen of Craighead County, Arkansas who is twenty (20) years of age.

     2.      Plaintiff seeks leave to proceed under a pseudonym due to fear of personal embarrassment, humiliation, and psychological trauma. Specifically, Plaintiff complains of acts of an intimate, sexual, and traumatic nature. The harm to Plaintiff would be compounded by the publication of her identity. Further, Plaintiff avers that there is substantial likelihood of harm arising from prejudice in obtaining admission to graduate programs arising from bringing suit against her former academic institution.

3.      The University of Memphis is a public university governed by the Tennessee Board of Regents System of Colleges and Universities, and it is owned and operated by the State of Tennessee.  It is located at 3720 Alumni Avenue, Memphis, Tennessee and may be served with process by serving the Attorney General of the State of Tennessee at 425 Fifth Avenue North – 2nd Floor, Nashville, Tennessee 37243.

4.      This Court has subject matter jurisdiction over the necessary particulars of this case under federal question jurisdiction, 28 U.S.C. § 1331, as it arises from Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681–1688.

5.      This Court has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, supplemental jurisdiction.

6.      This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and all Defendants are diverse and this is a civil action in which the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs as Plaintiff facially alleged facts that would support a contention of damages exceeding $75,000.00.

7.      Venue is proper in the Federal Court for the Western District of Tennessee at Memphis, as all or a substantial part of the actions giving rise to this suit occurred in Shelby County, Tennessee.

## I. Factual Allegations

8.      Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

A.      **The University's Duties Under Title IX**

9.      The University is a recipient of federal Department of Education funding and is therefore subject to Title IX.

10.     Title IX and 34 C.F.R. § 668.46(k)(2)(i) placed a duty on The University to establish and follow procedures for resolving allegations of sexual assault from investigation to final result that are prompt, fair, and impartial.

11.     The University's Sexual Misconduct Policy states that:

> Every reasonable effort shall be made to conclude the investigation and resolve the complaint within sixty (60) calendar days following receipt of the complaint. Within this sixty (60) day time frame, it is expected that the Investigator will conclude the investigation, prepare a written report and finding, and notify the parties in writing of the determination.

12.     Title IX and the Clery Act placed a duty on The University to take reasonable steps to protect the confidentiality of complainants.

13.     Title IX placed a duty on The University to prohibit retaliation and to take reasonable measures to prevent retaliation for complaints made under Title IX.

14.     Title IX placed a duty on The University to take strong responsive action if retaliation occurred.

15.     Title IX placed a duty on The University to investigate allegations of student-on-student sexual assault.

16.     The University's duty to investigate allegations of student-on-student sexual assault is independent of any request or position taken by a reporter of sexual assault.

17.     The University had a duty to perform an independent investigation such that it was insufficient to wait for the results of a police investigation.

18.     Title IX requires that individuals complaining of sexual assault be afforded interim accommodations.

19.     The University's Sexual Misconduct Policy states:

> **Interim Measures/Accommodations.** In situations that require immediate action to address safety or other concerns, the University will take any reasonable administrative action, through interim measures, that is appropriate. Interim measures may be applied to one, both, or multiple parties associated with the complaint. In such situations, the Investigator is responsible for implementing the interim measure(s) after consultation with the Title IX Coordinator and Legal Counsel. Complainants may also request interim measures as an accommodation. Examples of such interim actions include, but are not limited to:
>
> - Restrictions on contact between the complainant and the respondent;
> - Exclusion from areas of campus;
> - Providing an escort to ensure that the complainant can move safely between classes, meeting and activities;
> - Ensuring that the complainant and respondent do not attend the same classes or other necessary appearances;
> - Moving the complainant or respondent to a different residence hall;
> - Providing counseling services;
> - Providing medical services;
> - Providing academic support services such as tutoring;
> - Arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record.
> - Student respondents may be placed on Interim Suspension under the appropriate circumstances pending the outcome of the investigation. [See University procedures involving Interim Suspension at: http://www.memphis.edu/studentconduct/studenthandbook.htm].
> - In appropriate circumstances and consistent with University Human Resource policies, employee respondents may be placed on administrative leave pending the outcome of the matter.

**B.**      <u>The Sigma Chi Spring Party and Sexual Assault by Nicholas Wayman</u>

20.      Plaintiff was a junior at The University in the spring of 2017. She excelled academically, routinely making the Dean's List and earning a GPA of 3.8 as of the beginning of the spring semester of 2017. Plaintiff balanced academics with numerous academic and community-related extracurricular activities.

21.      Plaintiff was also an employee of The University working in the annual giving department.

22.      On April 1, 2017, Plaintiff attended a party at the Sigma Chi fraternity house on the U of M campus.

23.      On information and belief, the event was an approved "registered party" through The University of Memphis.

24.      The Interfraternity Council (hereinafter "IFC"), the campus organization through which fraternities are affiliated with The University of Memphis, carries strict policies that contain, among other things, the following:

         a.      Prohibiting the distribution of alcohol to those under legal drinking age;

         b.      Prohibiting the possession or use of illegal drugs or controlled substances during fraternity events; and

         c.      Prohibiting rape and sexual harassment and assault by its membership.

25.      The University of Memphis' Interfraternity Council requires that "[a]ll IFC chapters must **attach** written documentation from their national headquarters/regional office indicating knowledge and approval of any activities where alcohol may be present," in order for events to be approved through The University of Memphis. (emphasis in original)

26.     On information and belief the purpose of this policy is to ensure that the national fraternal organization takes responsibility for the activities of the local chapter and ensures that its membership does not engage in dangerous activity.

27.     In order to host an event, The University of Memphis claims to require fraternities to take "adequate precautions" to "prevent alcohol from being consumed by minors."

28.     The University of Memphis requires that there be one licensed and bonded security guard per every one hundred event attendees.

29.     Plaintiff avers that this party was a "registered party," advertised on campus and planned in advance, and that The University should have adhered to the foregoing policies.

30.     The University now claims that the April 1, 2017 party was a spontaneous, unregistered event, that no documentation of the event exists, and that it did not enforce these policies with regard to the event.

31.     The party on April 1, 2017 was, effectively, an "open party," with no apparent restrictions on who could enter and only one or two security guards for an event whose attendance by far exceeded two hundred people.

32.     No one checked student identification cards or government issued identification to verify attendance at the school or age of the attendees. No wristbands, stamps, markings, or other mechanism was used to distinguish those of legal drinking age from those who were not of legal drinking age.

33.     The members of Sigma Chi gave alcohol to minors and provided copious supplies of marijuana and cocaine to attendees, especially female attendees, regardless of age.

34.     While at the party Plaintiff consumed two glasses of champagne. She was offered other drugs including cocaine and marijuana, of which she took small quantities. A fraternity member gave Plaintiff a beer which she believes was laced with a "date rape drug."

35.     Plaintiff left the party believing that she was mildly intoxicated but not severely so. Shortly thereafter, she began to experience extreme confusion, inability to focus, and she became concerned that she could not get herself home.

36.     Plaintiff contacted fellow student Nicholas Wayman (hereinafter "Wayman"), with whom Plaintiff had been acquainted for two years.

37.     Plaintiff requested that Wayman drive her home and advised him that she believed that she had been drugged.

38.     Wayman drove to meet Plaintiff at her car and picked her up. Instead of driving her to her home, he drove her to his family home in Arlington, Tennessee.

39.     Plaintiff, due to her comfort with Wayman and his family, coupled with her level of intoxication, fell asleep in Wayman's bedroom.

40.     Wayman began to touch Plaintiff in a sexual fashion, penetrating her with his finger. Plaintiff told Wayman that she was too intoxicated and did not want to engage in sexual activity.

41.     At this point Plaintiff was only semi-conscious from the effect of her intoxication.

42.     Plaintiff has a vague memory of Wayman calling her name and of being unable to respond.

43.     Plaintiff then fell unconscious.

44.     Plaintiff awoke the next morning naked from the waist down. Based on the feeling in her genital area, she believed that she had been sexually penetrated, though she did not know precisely what had happened due to having been unconscious.

45.     Plaintiff experienced extreme emotional distress, feeling betrayed and violated. Plaintiff asked Wayman to drive her back to her vehicle. They did not speak during the drive.

46.     Plaintiff promptly went to the emergency department at St. Francis Hospital, who contacted Shelby County Rape Crisis Center. A "rape kit" was promptly administered, and Plaintiff was offered emergency contraception, tested for sexually transmitted diseases, and her genital area humiliatingly photographed to preserve evidence.

47.     On Monday, April 3, 2017, Plaintiff reported the assault to the Office of Institutional Equity (hereinafter "OIE") using the internal complaint process.

48.     This contact initiated The University's obligations under Title IX to investigate and adjudicate Plaintiff's claims of student-on-student sexual assault.

49.     When making the initial report, Darron Wibberding, the school employee with whom she had her initial contact, asked Plaintiff what she had been wearing the night of her rape. He then asked what kind of panties she had been wearing the night of her rape along with other degrading questions that implied that Plaintiff was responsible for her own rape.

50.     Plaintiff advised OIE that she had multiple classes with Wayman. Instead of making arrangements to remove Wayman from Plaintiff's classes, as required by Title IX, Michael Washington, the school's Title IX Coordinator (hereinafter "Washington"), advised Plaintiff that *she* could drop out of classes or take online courses for the remaining weeks of the semester.

51.     The University denied Plaintiff any accommodations at that time other than a parking pass to utilize an on-campus garage rather than the general parking lots.

52.     The University denied Plaintiff's request that Wayman be subjected to an interim suspension.

53.     The University, at that time, denied Plaintiff's request that she have an escort on campus.

54.     OIE took no steps to ensure that Plaintiff and Wayman did not have classes together.

55.     Plaintiff was forced to choose between attending classes with Wayman and skipping classes.

56.     OIE did not even take immediate steps to prohibit Wayman from having contact with Plaintiff.

57.     OIE, in effect, did virtually nothing to put interim measures in place in the immediate term. OIE did, eventually, place social restrictions on Wayman to permit Plaintiff to attend university-affiliated social events without fear of encountering him. Plaintiff also began to see a counselor at the student counseling office.

58.     OIE took no steps to reasonably ensure that Wayman did not have incidental contact with Plaintiff.

59.     On April 4, 2017, Plaintiff, afraid to be on campus, contacted her supervisor and asked to be removed from the work schedule.

60.     Also on April 4, 2017, Plaintiff sent an email to the Office of President M. David Rudd outlining her concerns that a greater priority was being placed on Wayman's "due process right" to attend classes than on her physical and psychological safety.

61.     President Rudd's office responded by scheduling a call for 7:00 a.m. on April 5, 2017, but he later cancelled that call without rescheduling. President Rudd did not again schedule an appointment with Plaintiff until October 16, 2017.

62.     On April 5, 2017, Melanie Murry, General Counsel for The University, sent Plaintiff the following email:

> Ms. [Doe],
> I really appreciate your willingness to meet with me and Dr. Winborn this morning. I know this is a difficult time for you and the University wants to make sure that we are doing what we can to provide a safe environment and that you are able to continue with your studies. There are a couple of things we are doing on our end as a result of our meeting this morning. You advised that you are not ready to resume your classes physically and would like to be able to do directed studies at least til (sic) the end of next week. My understanding is that you will learn whether the DA will prosecute the matter and you may be in a better place at that time. I have communicated this request to Michael Washington who will work to get this done. You also said that you would like to have an escort to and from your counseling sessions and classes if and when you resume those. We are working to either have an unarmed officer or another student to escort you. In your initial interview on Monday, you declined a no contact directive. We discussed the pros and cons with you this morning and I still believe it would be a good idea to implement, so check with the investigator and let me know what you want to do. I think this would assist you in feeling more comfortable on campus but it is entirely up to you and the option is still open. As Dr. Winborn mentioned the Counseling Center does take walk-ins and you can ask for her or your assigned counselor if you need assistance. I have attached the link below to the website for the organization we talked about this morning, HEALS. We talked about much more this morning and I didn't capture everything in this email but I wanted you to know that we are working on your matter. Please don't hesitate to reach out if you have any questions or need assistance.

63.     Melanie Murry immediately sent a follow-up email:

> Ms. [Doe],
> After I sent you this message, I realized that we had already implemented a no contact directive on Tuesday. As we discussed this morning, the no contact directive will remain in place. Let me know if you have any questions.

64.     Despite this so called, "no contact directive," Wayman was not required to avoid Plaintiff at all, as he was <u>still in classes with his victim</u>. As a direct result of The University's failure to put appropriate interim measures in place, Plaintiff could not attend certain classes without encountering her rapist.

65.     The University claimed to be unable to remove Wayman from classes, even on an interim basis, without violating his right to due process.

66.     On information and belief, The University did not even require Wayman to make a statement or otherwise deny the allegations against him.

67.     This refusal to remove Wayman from classes with Plaintiff is directly contradictory to any permissible interpretation of Title IX.

68.     The Department of Education has spoken directly to this issue. The 2001 *Revised Sexual Harassment Guidance: Harasssment of Students by School Employees, Other Students or Third Parties*, states in pertinent part:

> It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation.[1]

69.     Removal of Wayman from campus or, at the very least, from Plaintiff's classes was permissible under the Tennessee Uniform Administrative Procedures Act.

---

1 The 2001 *Guidance* is available on the Department's Website at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. The Dept. of Education promulgated the 2001 *Guidance* pursuant to notice-and-comment procedures, and it is therefore entitled to deference under *Cheveron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

70.    Removal of Wayman from campus or, at the very least, from Plaintiff's classes was permissible under the Tennessee Board of Regents' *Uniform Procedures for Cases Subject to the Uniform Administrative Procedures Act*, which states, in pertinent part, as follows:

> A student or employee charged with violations of policies, rules or regulations of the institution may be suspended by the president or director pending a hearing subject to these or alternate procedures when the person's presence poses a danger to persons or property or a threat of destruction to the academic or operational processes of the institution.

71.    The Tennessee Board of Regents' Policy P-80, *Discrimination and Harassment Complaint & Investigation Procedure* also authorizes interim suspensions pending the outcome of investigations.

72.    It states, in pertinent part, that:

> (3) In situations that require immediate action because of safety or other concerns, the institution may take any administrative action which is appropriate, e.g., administrative leave with pay pending the outcome of the investigation.
> (a) Students may be placed on interim suspension under the appropriate circumstances pending the outcome of the investigation.

73.    Despite these policies The University continued to represent to Plaintiff that "due process" prevented them from issuing an interim suspension.

74.    Despite Title IX's requirement that The University of Memphis conduct a prompt, fair, and reasonable investigation, Michael Washington discouraged Plaintiff from pursuing the Title IX complaint process. He advised Plaintiff that his investigation would imperil the ongoing criminal investigation and that there would likely not be sufficient evidence for OIE to take any action if he did investigate. In effect, The University's official responsible for investigating and remedying student-on-student sexual assault told Plaintiff that she would gain no benefit from asking him to do his job and may well jeopardize any possibility of justice.

75.     This failure to place interim measures in place, to discourage Plaintiff from exercising her rights under Title IX, and failing to investigate amounted to deliberate indifference to sexual harassment and retaliation that denied Plaintiff equal access to educational opportunities at The University.

**C.     <u>Sexual Assault by Tate</u>**

76.     On April 21, 2017, Plaintiff attended an off-campus charity party sponsored by the University of Memphis chapter of the Lambda Chi Alpha fraternity.

77.     She was accompanied by a close friend with whom she was then staying at the apartment complex, The Gather on Southern (hereinafter "The Gather").

78.     Plaintiff met another student later known to her as "T.J. Tate," (hereinafter "Tate").

79.     Plaintiff became agitated and uncomfortable and asked to leave the party. She asked her friend if they could leave, and her friend asked Tate to walk them to The Gather. On the way to The Gather, Plaintiff's friend stopped and went to her boyfriend's house, which was on the way. Tate accompanied Plaintiff to The Gather. Tate asked if he could sleep on the sofa so that he did not have to drive home after drinking. Plaintiff, though uncomfortable with this, thought that the request was reasonable and agreed, and Tate sat down to watch television. Plaintiff went alone into the bedroom, closed the door, changed into sleeping clothes, and went immediately to sleep.

80.     Sometime later, Tate entered the room, got onto the bed, and said, "Wanna f—k," as he placed his hands forcibly on Plaintiff. Plaintiff grew terrified. Tate then violently turned Plaintiff onto her stomach, yanked off her shorts and held her down on the bed while he forcibly raped her.

81.     Once Tate ceased raping her, Plaintiff pulled on her clothes and fled the apartment.

82.     Plaintiff locked herself in her car and frantically texted two of her friends. After Tate left and her friends came to the apartment, Plaintiff returned to the apartment. Plaintiff's friend contacted the building security guard who called the police. Exhausted and terrified, she made a report to the campus police and then Memphis Police Department.

83.     Plaintiff was again subjected to the humiliating and invasive procedure of a "rape kit." Fluid samples were again taken from inside her vagina. Her genitals were again inspected and photographed in order to preserve evidence. She was again screened for sexually transmitted diseases and offered emergency contraception.

84.     The campus police advised The University that Plaintiff had reported this second rape by another student, again triggering The University's duty under Title IX to investigate.

85.     Following the attack, Plaintiff learned that Tate was an "associate member" of Lambda Chi Alpha fraternity and that he was friends with Wayman.

86.     On information and belief, Tate was, at least in part, motivated by a desire to retaliate against Plaintiff for reporting Wayman for rape.

87.     Accordingly, Plaintiff alleges that The University's failure to implement adequate Title IX protections, to promptly address her claims of rape, and to place interim measures in place fostered an atmosphere of impunity in which Wayman's friends and fellow students believed that The University did not take rape and sexual assault seriously and in which complaints like Plaintiff's would simply be ignored.

88.     Plaintiff alleges that The University's failure to act in a prompt and reasonable fashion specifically contributed to Tate's decision to rape her for the second time in a month.

**D.**      **The University Further Botches the Title IX Process and Accommodations**

89.      On April 25, 2017, Plaintiff was selected to participate in the LeaderShape program, a valuable extracurricular opportunity. Wayman was also selected. Plaintiff, having already been advised that OIE would not remove Wayman from any of his academic opportunities, removed herself from consideration.

90.      On April 26, 2017, five days after the second assault, H. Phuong Nguyen (hereinafter "Nguyen") contacted Plaintiff to advise that OIE would need to open a new investigation. She did not schedule Plaintiff to meet and make her complaint until May 1, 2017, a full eleven (11) days after the second assault. OIE put no interim measures in place.

91.      On May 3, 2017, Plaintiff inquired about whether Tate had appeared to make a statement. OIE put no interim measures in place.

92.      On May 4, 2017, H. Phuong Nguyen of OIE advised Plaintiff that OIE had sent Tate notice of the investigation, confirmed that it was delivered and read, and given him five days to respond. OIE still put no interim measures in place.

93.      On May 8, 2017, seventeen (17) days after making her complaint, OIE advised Plaintiff that Tate had not responded within the requisite five (5) day period and sent a second notice. Despite having now afforded Tate notice of charges, confirmed delivery of said notice, and having given Tate an opportunity to respond, the very essence of due process, OIE put no interim measures in place regarding Tate.

94.      At this point, OIE had afforded Tate all of the opportunity to respond required under basic notions of procedural due process, the Tennessee Uniform Administrative Procedures Act, Title IX, and the Tennessee Board of Regents Policies, yet OIE still refused to put interim measures in place and did not promptly complete the investigation.

95.     On May 10, 2017, Plaintiff advised OIE that Wayman had been engaging in campus events in violation of the interim measures related to him and provided photographic evidence from social media posts.

96.     Five days later, on May 15, 2017, OIE advised Plaintiff that the Office of Student Conduct was "looking into" whether Wayman's blatant violation of the interim measures was, in fact, a violation. OIE took no additional measures with regard to Wayman.

97.     Also on May 15, 2017, OIE advised Plaintiff that the Title IX coordinator had managed to interview Tate and that the investigation was "in progress."

98.     On May 17, 2017, Plaintiff passed Wayman near her place of work on campus while he was playing basketball with his fraternity and provided photographic evidence, again flouting the limited interim measures put in place by OIE. OIE took no action.

99.     On May 18, 2017, OIE informed Plaintiff that they were "holding the case in abeyance pending the criminal investigation."

100.    Though OIE claimed that this was due to Plaintiff's request, it is also clear that OIE advised Plaintiff that holding the case "in abeyance" may be necessary to avoid tainting the criminal investigation.

101.    In effect, The University told Plaintiff that they could not manage the duty of completing a prompt, fair, and impartial Title IX process without risking the criminal prosecution of her rapist.

102.    The University effectively forced Plaintiff to choose between the success of a criminal prosecution and providing an educational environment free from discrimination that was so severe, persistent and pervasive as to deprive her of equal access to education in violation of Title IX.

103.     Title IX and its attendant federal regulations make no provision to hold an investigation "in abeyance" pending the outcome of criminal investigations.

104.     On May 30, 2017, over a month after Tate's rape of Plaintiff was reported to The University by campus police, OIE had still placed no interim measures in place as to Tate and had utterly failed to enforce the limited interim measures as to Wayman.

105.     That same day, May 30, 2017, Plaintiff contacted OIE and advised that Wayman was being prosecuted and that Tate would not be prosecuted until the results of the rape kit were returned, which could take nine to ten months.

106.     Plaintiff inquired: "What are the options/measures we can take until that period is over?"

107.     Plaintiff also reported the vandalism of her vehicle: "I know there's nothing that could be done really, but Monday night someone threw things at my car while I was parked in either Lot 17 or at El Toro Loco. I'm not positive that it's retaliation but I did see several people who know about the cases at El Toro Loco that night. Nick and his frat brothers all know what kind of vehicle I drive."

108.     On May 31, 2017, Nguyen again advised that OIE was holding the Wayman case in abeyance. The University still failed to enforce the limited interim measures.

109.     Nguyen advised that OIE was "moving forward with the investigation" into Tate. Nguyen inquired whether Plaintiff wanted the investigation of Tate held "in abeyance" as well.

110.     Nguyen went on: "I'm unclear about the options/measures you refer to, do you mean possible interim measures such as a No Contact Directive? Do you have concerns for your safety? Has the Respondent attempted to contact you?"

17

111.    One month and nine days following the initiation of the Title IX process, The University had done nothing other than briefly interview Tate. The University had not, at this stage, even placed a No Contact Directive in place as to Tate. No interim measures of any kind were in place at this point.

112.    Despite Plaintiff's request for interim measures, The University did not even provide Plaintiff with rudimentary support services during the summer 2017 semester.

113.    On June 1, 2017, Plaintiff advised that she wanted the investigation to proceed.

114.    Neither Plaintiff, Tate, nor Wayman were enrolled in summer classes, but Plaintiff continued to work on campus.

115.    On June 1, 2017, The University advised Plaintiff that they had determined that Wayman had, in fact, violated the interim measures.

116.    In response to The University's determination that Wayman had violated the interim measures, The University issued a suspension for Wayman until August 27, 2017, the first day on which Plaintiff would actually return to classes.

117.    At that point The University was on notice that Wayman and Plaintiff would be in classes in the same building, Clement Hall.

118.    On June 2, 2017, Plaintiff specifically requested that the school make certain that Wayman and Tate "can't be near me on campus. . . ."

119.    On June 2, 2017, Nguyen sent the following email:

Dear [Jane],

The closest we can get to regulate the Respondent's contact with you is a No Contact directive from the Office of Student Conduct, which will prohibit him from contacting you by any means of communication (phone, text, social media, in person or through another person). Would you like to have OSC issue one to the Respondent?

> As for the class schedule, that would not be possible as it would violate FERPA law. As an alternative, we can always make arrangements with your professors should you prefer to limit your need to come on campus. Please let me know.

120.     The information contained in this email is directly contradictory to multiple aspects of Title IX as interpreted through the 2001 *Revised Sexual Harassment Guidance: Harasssment of Students by School Employees, Other Students or Third Parties.*

121.     From early April 2017 through the end of the spring semester, Plaintiff attended counseling sessions at the student counseling center, sessions that were initially arranged by OIE.

122.     During those sessions in late April, Plaintiff's counselor identified a need for medication. Plaintiff's counselor advised Plaintiff of this need for medication and inquired about her insurance coverage status. Plaintiff was covered by an out-of-state insurance policy that did not provide in-network benefits to Plaintiff for services and medications rendered in Memphis.

123.     Plaintiff's counselor approached her supervisor regarding the school's ability to provide the uncovered medications. The counselor subsequently advised Plaintiff that if Plaintiff had been uncovered by insurance that she would be eligible to have those medications paid for in their entirety by the school, but the school's policy did not permit the school to cover insured students. Plaintiff was compelled to seek the approval of her insurance company and seek counseling and medication through private treating professionals. While she was ultimately able to do so, her necessary treatment was delayed by approximately one month.

124.     While on its face a delay of a single month may seem insignificant, victims of trauma who are provided proper medication and therapeutic intervention during the critical period immediately following the trauma have significantly higher rates of avoiding the onset of

Posttraumatic Stress Disorder (hereinafter "PTSD"), significantly fewer and less severe symptoms of PTSD, and a higher rate of recovery from PTSD.

125.    Plaintiff has been diagnosed with PTSD as a direct result of the assaults by Wayman and Tate.

126.    Despite Plaintiff's diagnosis of PTSD and Rape Trauma Syndrome, when Plaintiff requested counseling appointments over the summer of 2017, the student counseling center refused to make the appointments, citing a university policy against offering counseling services during semesters when students are not actively enrolled in classes.

127.    On June 8, 2017, despite Plaintiff's ongoing distress and her requests for interim accommodations, Jerez Roberson Mitchell, a doctoral student intern in the counseling office, sent Plaintiff a referral list of psychologists in the area.

128.    The University offered no payment arrangements for these mental health providers.

129.    On August 3, 2017 the Shelby County Grand Jury indicted Wayman on charges of Rape and Sexual Battery.

130.    On August 7, 2017 a warrant was issued for Wayman's arrest. Wayman was arrested that same day.

131.    On August 9, 2017, Melanie Murry requested a copy of Plaintiff's fall schedule "to make sure that [Plaintiff was not] in any classes with any of the Respondents."

132.    In that same correspondence, Murry also advised Plaintiff that "the Office of Institutional Equity is in transition as Michael Washington has recently left the office and a new director should be starting before the end of this month."

133.    On information and belief, Michael Washington, the school's Title IX Coordinator, was given the choice between resignation and going through a termination process.

134.    Plaintiff was stunned and dismayed that the indictment and arrest of her rapist did not rise to the level of "appropriate circumstances" for an interim suspension of Mr. Wayman, who had already violated the more limited interim measures.

135.    Until August 15, 2017, The University was without a Title IX Coordinator.

136.    On August 25, 2017, Kenneth Anderson (hereinafter "Anderson"), the replacement Title IX Coordinator, requested evidence related to both the Wayman and Tate complaints. This was the first time that The University asked Plaintiff for a list of witnesses, copies of police reports, copies of Rape Crisis Center reports, documentation of her PTSD and Rape Trauma Syndrome diagnoses, and any other evidence in her possession.

137.    On August 25, 2017, Anderson sent Plaintiff an email acknowledging that despite Plaintiff's notice to The University of her schedule and request for accommodations and interim measures as early as April 3, 2017, The University had permitted Wayman to register for a class in the same building as Plaintiff and at the same time as one of Plaintiff's classes, ensuring that they would be in proximity and likely to encounter each other.

138.    Anderson stated that "we were unable to move the classes under such late notice," (emphasis added).

139.    Anderson stated that because the classes were on different floors, "it has been communicated to Mr. Wayman that he will only be able to enter and exit [the building] through the side entrance near his class on the north side of the building . . . immediately before and after class." Anderson went on to state that Plaintiff could use a different entrance and thus avoid

Wayman. Notably, at the time of this email, <u>Wayman was still suspended from campus for his</u> <u>violations of previous interim measures</u>.

140.     Anderson concluded his email "Otherwise, best wishes on starting the new academic semester!"

141.     Despite Anderson's best wishes, Plaintiff did not experience a good beginning to the semester. She remained frightened of seeing Wayman and Tate, and she experienced severe anxiety about attending classes, especially classes in Clement Hall, where she knew that she might encounter Wayman. Further, at this time both she and The University were aware of the indictment of Wayman, which sharply increased Plaintiff's risk of exposure to retaliation.

142.      Plaintiff proceeded to gather and provide whatever evidence was available to support her Title IX complaint to Anderson and OIE. On September 1, 2017, Plaintiff contacted Anderson to request additional support services and interim measures.

143.     On September 5, 2017, Anderson wrote to "confirm" her request for additional interim measures, specifically limiting those to restrictions on Wayman's access to the school recreation center at specific times that Plaintiff knew she would be utilizing the recreation center.

144.     By this point, Plaintiff was hyper-vigilant and experienced severe anxiety any time she was on campus. Wayman was under indictment, yet it was Plaintiff who had to avoid virtually every part of campus that she had not previously and specifically requested permission to go, lest she encounter her rapist. Tate was not even subject to such limited restrictions, the second assault having apparently been totally forgotten by The University.

145.     During the week of October 2, 2017, a student reporter for the Daily Helmsman, the University of Memphis school newspaper, learned Plaintiff's identity from a mutual acquaintance and contacted her for comment on a story that he intended to publish.

146.    Plaintiff did not particularly want the details of her story published for the entire campus to read, but she was left with the impression that the article would be limited to the incident involving Tate, would not provide enough information to identify her, would be published using a pseudonym, and would be submitted to her for review prior to publication.

147.    The Daily Helmsman reporter did, in fact, submit an article to her for review and fact check, though he did so at approximately midnight. The following day Plaintiff read the article and learned that it was not about the specific near-campus incident, but was instead about her specifically.

148.    On October 10, 2017, the article was published with the headline "Student Raped Twice in 20 Days: Alleged Assailants Remain U of M Students."

149.    The article, which identified her under the pseudonym "Caroline," gave specific and particular details about both rapes, the university response, and extensively purported to quote "Caroline." In fact, the article contained numerous factual inaccuracies and some inaccurate quotations.

150.    Almost immediately the campus environment became shockingly hostile.

151.    On October 12, 2017, students created an account on Twitter titled "Free Nick Wayman" with the Twitter user ID "hoesbelyin_."[2]

152.    The sole subject matter posted by or on @hoesbelyin_ related to a discussion of Plaintiff's rape allegations against Wayman. Students blamed the victim for her own sexual assault, claimed that her clothing had implied consent, claimed that her PTSD diagnosis was not real, and made numerous other disparaging and hostile claims about Plaintiff.

---

2 In the event that the Court is not fluent in Twitter colloquialisms, this is shorthand for "whores be lying."

153.    The Twitter account posted that "We must stand up for our brother." Therefore, on information and belief, @hoesbelyin_ was opened by members of the Lambda Chi Alpha fraternity.

154.    On October 13, 2017, a female student at University of Memphis who vocally supported Wayman in this vulgar, hostile, and degrading Twitter debate maliciously revealed Plaintiff's actual identity to the University of Memphis community.

155.    Plaintiff advised OIE that a fellow student had revealed her identity to the campus. OIE responded that because she was not making "direct threats" that they could not do anything.

156.    Plaintiff became even more anxiety-ridden than previously. She could not appear on campus without being surrounded by people who believed they knew the facts of the two rapes. She could not appear on campus without encountering people who held strong, hostile opinions about her.

157.    Fellow students continued to post hostile comments on social media, to disparage her, and to call her a liar.

158.    Despite the fact that Plaintiff's second rape was reported to The University on April 21, 2017, The University still had not completed any Title IX process with regard to Tate and he remained on campus.

159.    On October 16, 2017, Plaintiff attended a meeting with President M. David Rudd, her student counseling center psychologist (a U of M employee), and Melanie Murry, University Counsel.

160.     President Rudd began the meeting by expressing condolences for Plaintiff's plight. Immediately afterwards, he stated that he was unaware of any evidence that any steps that universities took to prevent sexual assault actually reduced the incidence of sexual assault.

161.     After brief further discussion, the parties agreed that the remainder of the meeting would be confidential.

162.     Notably, the Centers for Disease Control actively suggests that schools utilize two programs in the college and university setting that have been shown through rigorous systematic review to decrease the incidence of sexual violence.

163.     President Rudd's position along with his office's deliberate choice to cancel and not reschedule Plaintiff's April 5, 2017 call indicates not only deliberate indifference to her allegations of severe, persistent, and pervasive sexual harassment but, indeed, deliberate indifference to sexual misconduct in general.

164.     On October 18, 2017, Plaintiff met with OIE.

165.     OIE advised Plaintiff that there had been a "misunderstanding" that resulted in the investigation of her cases being "held in abeyance."

166.     OIE conducted an interview of Plaintiff as to the allegations against Tate only.

167.     That same day, OIE sent Plaintiff a letter stating that

> You have completed your interview today regarding facts related to Respondent Tate. Thus, as I explained at the conclusion of your interview, the next procedural steps are to interview the Respondent, and any witnesses identified by your or Mr. Tate that may have relevant information about the alleged sexual assault. Additionally, OIE will be reviewing all evidence produced as a result of the investigation and then drafting and submitting and investigative report to the parties.

168.     In essence, OIE began a completely new investigation of Tate nearly six months after Plaintiff initiated her Title IX complaint against Tate.

169.     OIE advised Plaintiff that the completion of the investigation would take at least three to four weeks and further indicated that they may need to hold the investigation open until such time as Memphis Police Department completed processing of her rape kit.

170.     As of October 18, 2017, The University stood by their position that there was no basis for an interim suspension of Tate from campus.

171.     Accordingly, Plaintiff still could not appear on campus without a reasonable and well-founded fear of encountering both of her rapists.

172.     As of the time of filing of this Complaint in January of 2018, eight months after the initial Title IX complaint against Tate, the University has taken no final action as to Wayman, and Tate remains on campus, having never been subjected to even so much as an interim suspension.

173.     Plaintiff remains in fear for her safety, continues to suffer from severe anxiety, Posttraumatic Stress Disorder, Rape Trauma Syndrome, emotional and psychological pain and suffering, and humiliation.


## Causes of Action

## II. Count 1: Denial of Equal Access to Education on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX)

174.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

175.     The acts, and failures to act, perpetrated against Plaintiff amounted to unlawful sexual harassment, retaliation, and discrimination on the basis of gender.   One or more administrators or officials of The University, with authority to take corrective action on

Plaintiff's behalf, had actual notice of said discrimination and failed to adequately respond, in violation of their own policies and Title IX. Those failures amounted to deliberate indifference toward the unlawful conduct that occurred, was occurring, or was likely to occur.

176.     Additionally, and/or in the alternative, The University failed to enact and/or disseminate and/or implement proper or adequate policies to discover, prohibit or remedy the kind of discrimination that Plaintiff suffered. This failure included, without limitation, non-existent or inadequate customs, policies, or procedures for the recognition, reporting, investigation, and correction of unlawful discrimination. Those failures amounted to deliberate indifference toward the unlawful conduct that had occurred, was occurring, or was likely to occur.

177.     The University acted with deliberate indifference in deviating significantly from the standards outlined in The University's student handbook, code of student conduct, sexual misconduct policy, its own Title IX policies and procedures and its own employment policies and procedures.

178.     As a result of The University's deliberate indifference, Plaintiff suffered discrimination on the basis of gender that was so severe, persistent, and pervasive as to deprive her of equal access to educational opportunities at The University.

179.     Plaintiff has and will continue to incur attorney fees and costs of litigation.

### III. Count 2: Negligent Failure to Train and/or Supervise by The University of Memphis

180.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

181.     The University owed Plaintiff a duty of care to adequately train and supervise their employees, fraternities, and their members, and officers in accordance with its own internal policies and procedures and applicable state and federal law.

182.     The policies and practices of The University, including failure to properly warn, train, and/or educate its students/members regarding the prevention of sexual harassment and/or assault, and the failure to properly investigate reports of sexual harassment and assault have a disparate impact on Plaintiff as a female by subjecting her to increased levels of sexual abuse, assault, and other violence on campus in comparison to male students and by subjecting her to increased levels of emotional distress and other harm by virtue of their failures to promptly and appropriately address complaints of sexual assault.

183.     The policies and practices of The University, including failure to properly warn, train, and/or educate its students/members in the provision of alcohol to persons under the legal drinking age and the provision of illicit drugs to persons in attendance at official events led to Plaintiff's impaired state, which left her vulnerable to her rape on the evening of April 1, 2017.

184.     The University breached its duty of care when it failed to adequately train and/or supervise their students/members in accordance with its own internal policies and procedures and applicable state and federal law. As a direct and proximate result of their breach of their duty of care, Plaintiff has suffered damages both actual and consequential in an amount to be established to the Court.

### IV. Count 3: General Negligence By The University of Memphis

185.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

186.     The University owed Plaintiff a general duty of care that included ensuring that student organizations followed its policies regarding the provision of alcohol to persons not of legal drinking age and the furnishing of illicit drugs to students and attendees at university-sanctioned events.

187.     The University breached its duty of care when it failed to enforce its own internal policies and procedures and applicable state and federal law. As a direct and proximate result of their breach of their duty of care, Plaintiff has suffered damages both actual and consequential in an amount to be established to the Court.

## VII. Damages

188.     As a result of Defendants' conduct Plaintiff has suffered damages for deprivation of her rights under Title IX, damage to reputation, lost income, medical expenses, physical pain and suffering, and mental and emotional distress to be established to the Court not in excess of five million dollars ($5,000,000.00).

**WHEREFORE PREMISES CONSIDERED, Plaintiff prays that:**

1.     This Court empanel a jury for the trial of this matter;

2.     This Court enter a judgment against Defendants in an amount to be established to the Court not in excess of $5,000,000.00;

3.     This Court fashion any appropriate equitable remedy;

4.     This Court award Plaintiff attorney's fees, suit expenses and costs; and

5.     This Court order any further relief to which Plaintiff may prove she is entitled.

Respectfully submitted,

BLACK MCLAREN JONES RYLAND & GRIFFEE
A Professional Corporation

By:    /s/Brice M. Timmons_____
         BRICE M. TIMMONS    #29582
         WARREN P. CAMPBELL   #30096
         530 Oak Court Drive, Suite 360
         Memphis, Tennessee  38117
         (901) 762-0535 – telephone
         (901) 762-0539 – facsimile
         btimmons@blackmclaw.com
         *Attorneys for Plaintiff*