**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS**

JANE DOE,

    Plaintiff,

v.                                                      Docket No. 2:18-cv-02032-MSN-cgc

THE UNIVERSITY OF MEMPHIS,            JURY DEMAND

    Defendant.

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Plaintiff Jane Doe (hereinafter "Plaintiff"), by and through the undersigned counsel, submits this Response in Opposition to the Motion for Summary Judgment (hereinafter "Defendant's Motion") (ECF 46) filed by Defendant, The University of Memphis (hereinafter "Defendant" or "the University"), and states as follows:

**INTRODUCTION**

On January 11, 2018, Plaintiff brought a Complaint in this Court against the University for violation of Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681-1688 ("Title IX"), alleging that one or more officials with the University, with authority to take corrective action on Plaintiff's behalf, had actual notice of acts and failures to act by the University following reports of sexual assaults of Plaintiff, but these officials failed to adequately respond in violation of the University's own policies and Title IX (ECF 1). Plaintiff's claims arise from the University's failure to timely and adequately investigate and respond to her complaints of rape and to take steps to protect her

from further sexual harassment such that she underwent and was made liable to additional harassment.[1]

Plaintiff proceeds under two distinct theories of liability, both supported by her factual allegations in her pleadings and Title IX. First, Plaintiff proceeds under a "deliberate indifference" theory of liability, alleging that Defendant's failures to respond to her complaints led to further harassment or vulnerability to further harassment. Second, Plaintiff proceeds under a "hostile environment" theory, alleging that her educational experience was so permeated with intimidation as to exclude her from the educational programs and activities of Defendant, the funding recipient. In her original Complaint, Plaintiff also alleged claims for negligent failure to train and/or supervise and general negligence.

Defendant filed its first Motion to Dismiss on March 5, 2018 (ECF 14). In response, Plaintiff filed an Amended Complaint on March 21, 2018, which maintained the Title IX claim while removing claims arising under state law (ECF 17). The Court denied Defendant's motion to dismiss as moot following the filing of the Amended Complaint. Subsequently, on April 9, 2018, the Defendant filed its second motion to dismiss, alleging Plaintiff had failed to plead facts sufficient to state a claim for which she is entitled to relief (ECF 19). On February 6, 2019, Defendant filed a motion for summary judgment, alleging that Defendant did not have substantial control over the context in which the two assaults occurred and, therefore, cannot be liable to

---

[1] The standard "made liable to additional harassment" is key here. When the University failed her, Plaintiff took steps to protect herself by avoiding her attackers. To do so she had to skip classes and drop out of extracurricular activities. Title IX does not require that a student give her harassers (or in this case rapists) additional opportunities to cause her harm. To require this would be absurd on its face and discourage students from taking responsibility for their own safety and well-being. It would result in schools being held liable for claims by students who do nothing to protect themselves while avoiding responsibility for failing to protect students who do protect themselves. Such a rule would punish personal responsibility.

Plaintiff under Title IX (ECF 31).[2] On March 19, 2019, Plaintiff filed her Second Amended Complaint (ECF 45) to which Defendant responded by filing the instant motion to dismiss or for summary judgment.

## LAW AND ARGUMENT

Defendant is not entitled to either dismissal or summary judgment because Plaintiff has alleged and created a genuine issue of material fact as to both of her theories of liability.

### I.  Legal Standard

#### A.  Standard of Review for Motions to Dismiss

The standard for analysis of a Rule 12(b)(6) motion is set forth in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). An examination of the *Twombly* opinion is essential to a correct ruling on the pending motion. The *Twombly* opinion recites a set of rules to be applied when considering a motion to dismiss: Factual allegations must be enough to raise a right to relief above the speculative level. "The pleading must contain something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555-56 (citations omitted).

Following *Twombly*, the Supreme Court issued its opinion in *Ashcroft v. Iqbal*. 556 U.S. 662 (2009). Relying on *Twombly,* the opinion holds that "[t]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678. *Iqbal* requires a plaintiff only to "state a claim to relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[2] As a preliminary matter, Plaintiff is not suing the University for the harm directly arising from the first sexual assault. Her suit is based on the University's failures following her report of that assault. She does, however, contend that the University's failures led directly to her second assault a mere 20 days later.

liable for the misconduct alleged." *Id.* This standard is not a "probability requirement," as "it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.*

### B. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The driving inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

When considering a motion for summary judgment, trial courts are required to "view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" at summary judgment. *Anderson*, 477 U.S. at 255. In other words, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249; *see also Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003) ("This court does not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury.").

In a motion for summary judgment, a court must consider the facts alleged by the Plaintiff in "the light most favorable" to her. *Ercegovich*, 154 F.2d at 349. Here, Defendant is attempting

4

to circumvent this standard by filing, and relying heavily upon, an affidavit from Kenneth Anderson, the current Office of Institutional Integrity and Title IX Coordinator at the University of Memphis. Pursuant to Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must . . . set out facts that would be admissible in evidence . . . ." Fed. R. Civ. P. 56(c)(4). However, the affidavit of Kenneth Anderson contains factual allegations that are hearsay and thus inadmissible in evidence. As a result, this Court should not consider these allegations when ruling on the Defendant's motion for summary judgment.

> **C. Defendant is not entitled to dismissal or summary judgment in this matter because Plaintiff's suit is for the University's failures leading to exposure to sexual harassment on campus and because hostile environments on campus can and do arise from sexual assaults off campus.**

Genuine issues of material fact exist sufficient for submission to a jury to determine whether the University's utterly botched response to Plaintiff's reported rapes by fellow students fell short of its duties under Title IX. Defendant's sole legal theory is that it is not responsible for Plaintiff's rapes because it did not exercise substantial control over the environments in which they happened. This defense is wide of the mark in that Plaintiff has not sued Defendant for her rapes. She has sued Defendant for its deliberate indifference to her harassment and liability to harassment following those rapes, and for fostering a hostile environment on campus that resulted from both the rapes themselves and her reports of the rapes to the police and the University. The sole defense raised in Defendant's Motion is that it is not liable under Title IX because Plaintiff was raped off campus. If Plaintiff were suing Defendant for being raped by Wayman, Defendant might be successful. She is not. In order for Defendant to evade liability under its theory the Court would be required to ignore all of the harassment, liability to harassment, and failures to protect Plaintiff from harassment that occurred on campus. Further, the Court would be required to rule in direct contravention to all relevant precedent. While numerous courts have held that a hostile

5

environment can stem from a sexual assault occurring outside the workplace or off campus, Plaintiff is aware of no case to the contrary.

### i. Plaintiff was subjected to harassment on campus under the Gebser/Davis standard, and the University was deliberately indifferent to that harassment.

The Supreme Court has set out the standard for proving a Title IX violation for sexual harassment in a pair of cases, *Gebser v. Lago Vista Independent School District,* 524 U.S. 274 (1998), and *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), commonly referred to as the "Gebser/Davis Standard." The Gebser/Davis Standard first requires a potential sexual harassment plaintiff to have given notice to an appropriate official of the funding recipient (school) and for the school to have failed to take adequate remedial action, meaning it responded with deliberate indifference. *Gebser,* 524 U.S. at 288-90. If there is deliberate indifference, and when the harassment is student-on-student, the funding recipient's deliberate indifference must then "subject" the potential plaintiff to harassment, meaning the indifference must "cause [the potential plaintiff] to undergo harassment or make them liable or vulnerable" to harassment. *Davis*, 526 U.S. at 644-45. *Davis* analyzes the language of Title IX in minute detail before announcing the holding that a plaintiff need only be made "liable or vulnerable" to harassment. *Id.* This terminology is not used carelessly or in a manner meant to invite creative interpretation, but is instead is predicated on the "language of Title IX itself."[3] *Id*. at 645.

Expounding on the Gebser/Davis Standard, to impose liability on a school under Title IX for student-on-student harassment, a plaintiff must show:

---

[3] It is an oft-overlooked aspect of the Gebser/Davis Standard that it addresses Title IX violations exclusively in the sexual harassment context and relates exclusively to the damages remedy. Neither case addresses any other type of Title IX violation, including hostile environment claims, or any form of equitable relief.

6

> (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school;
>
> (2) the funding recipient had actual knowledge of the sexual harassment; and
>
> (3) the funding recipient was deliberately indifferent to the harassment.

*Dibbern v. Univ. of Mich.*, No. 12-15632, 2013 U.S. Dist. LEXIS 163538, at *18 (E.D. Mich. Nov. 18, 2013) (citing *Soper v. Hoben,* 195 F.3d 845, 854 (6th Cir.1999)). The funding recipient school is deliberately indifferent if it responds to known peer harassment in a manner that is clearly unreasonable. *Davis,* 526 U.S. at 648-49.

In a consistent but slightly more detailed analysis, the Ninth Circuit articulated the Gebser/Davis Standard as summarized below:

> 1. That the school exercised substantial control over both the harasser and the context in which the known harassment occurs;
>
> 2. That the conduct complained of is "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school";
>
> 3. The school had actual knowledge of the harassment. Actual knowledge requires that at least one official of the school who has authority to address the alleged discrimination/harassment and to institute corrective measures on the school's behalf knew of the harassment; and
>
> 4. ***If the school does not engage directly in the harassment, then a showing of "deliberate indifference" which must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.*** Deliberate indifference occurs only where the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."

*Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (discussing the requirements set out in *Davis*) (internal citations omitted) (emphasis added).

Defendant argues that because the assaults themselves occurred off-campus and it did not exercise control over the context in which *the assaults themselves occurred*, it cannot be liable to

7

Plaintiff under Title IX. Defendant, however, misstates Plaintiff's claim for relief as for the rapes themselves:

> [T]he 'discrimination' that Title IX prohibits is not the acts of sexual assault or sexual harassment in and of themselves, but rather the differential treatment by a funding recipient of persons of a particular sex who are taking part or trying to take part in its educational program or activity but are suffering acts of sexual harassment or assault that undermine their educational experience.

*Doe v. Brown Univ.*, 896 F.3d 127, 132 (1st Cir. 2018). A plaintiff may proceed under two theories of liability when alleging Title IX violations.

> **A plaintiff may allege that the funding recipient had actual knowledge of, and was deliberately indifferent to, prior complaints of harassment, which led to the current harassment for which redress is sought.** Alternatively, a plaintiff may allege that the funding recipient was on notice of, and was deliberately indifferent to, the plaintiff's complaints concerning the current harassment, which deprived the plaintiff of the educational benefits and opportunities provided by the funding recipient.

*Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1165 (D. Kan. 2017) (emphasis added). "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subjects' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 644-45. The harasser must be under the school's disciplinary authority. *Id.* at 646-47. The term "subjects" is analyzed in minute detail in *Davis*, and it is this language that the Court held to include actions or failures to act that make a potential plaintiff "vulnerable or liable" to further harassment. *Id.* at 644-45.

Defendant's analysis of the Gebser/Davis Standard is plainly erroneous and would exclude an entire universe of cases clearly contemplated under the Supreme Court's holding. Defendant implies that a bright line rule exists that precludes Title IX liability for failure to discipline conduct

8

that occurs off-campus. (Never mind that Defendant ignores that the gravamen of Plaintiff's complaint sounds in on-campus exposure and vulnerability to further harassment.) Such a bright-line rule has never been promulgated by any court. In analyzing the obligations of Kansas State University to discipline off-campus conduct, the United States District Court for the District of Kansas reasoned:

> As an initial matter, the Court notes that KSU appears to have argued in its initial briefing that, as a general matter, activities occurring off campus and at private parties cannot give rise to Title IX liability. KSU cites *Yeasin v. University of Kansas*, in which it argued in an amicus curiae brief "that Title IX does not require a school to sanction students for off-campus conduct." In *Yeasin*, the Kansas Court of Appeals held that the University of Kansas did not have the authority to expel a student under Title IX for sexual harassment that occurred online, off campus, and not within a University sponsored program or activity. KSU focuses on a statement the court made that "[i]t seems obvious that the only environment the University can control is on campus or at University sponsored or supervised events." However, the Court made clear that it was not resolving "whether Title IX requires a recipient to Title IX funds to discipline off-campus conduct." **To the extent KSU argues here for a general prohibition on Title IX liability for harassment that occurs off campus, such a bright-line rule is foreclosed by *Rost*.**

*Farmer v. Kan. State Univ.*, 2017 U.S. Dist. LEXIS 37100, at *24-25 (D. Kan. Mar. 13, 2017) (emphasis added); *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX."). Accordingly, no such bright-line rule protects the University here from claims arising from off-campus conduct.

Moreover, there is no law that would protect the University from on-campus conduct that incidentally flows from prior off-campus sexual assaults. The *Yeasin* Court acknowledged that off-campus assault can have continuing effects on-campus, quoting from the Department of Education's guidance on the issue:

> Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school,

9

> regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

*Yeasin v. Univ. of Kan.*, 360 P.3d 423, 430 (Kan. Ct. App. 2015).

This remains the standard today under the current guidance, issued in 2017. "Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 22, 2017).[4] In other words, no court to address the issue and no interpretation of the Department of Education's Office of Civil Rights in any administration has permitted funding recipients to simply ignore the on-campus collateral effects of off-campus sexual assaults.

Further, the University's position flies in the face of its own sexual misconduct policy, which states, in pertinent part: "These procedures are available for use by the following individuals and may apply to incidents occurring **on or off campus**. . . ." (emphasis added). (Affidavit of Plaintiff at Exh. 1 "GE2031 Sexual Misconduct and Domestic Violence Policy," p. 1. (issued September 23, 2015).) The University's own policy makes clear on its face that the purpose of this policy is to conform to Title IX:

> This policy is adopted by the University of Memphis specifically to address sexual misconduct which includes the following offences: dating violence, domestic violence, sexual assault, and stalking; and, to establish procedures for responding to incidents of sexual misconduct. Sexual misconduct is a form of sex

---

[4] It is worth noting that the Department of Education has maintained this standard despite the Department's decision under the current administration to revoke and replace all of the Title IX guidance issued during the previous administration.

discrimination prohibited by Title IX and the University of Memphis. The University is committed to eliminating any and all acts of sexual misconduct and discrimination on its campus. Any allegation of sexual misconduct as defined herein will be investigated and adjudicated according to this policy and in compliance with Title IX of the Education Amendments of 1972. Section 485(f) of he HEA, as amended by Section 304 of the Violence Against Women Reauthorization Act of 2013, the regulations implementing these Acts found at 34 CFR § 668.41, 668.46, and Appendix A to Subpart D of Part 668.

(Id.) From this statement of purpose, it is clear that the University itself understands that in order to comply with Title IX's mandate to remedy sex discrimination on campus that it must enforce a policy that addresses certain instances of sexual misconduct on campus. The on-campus effects of Wayman and Tate's assaults on Plaintiff are just the sort of harassment that Title IX seeks to remedy.

Plaintiff in this case alleges, and the undisputed facts support, that she put Defendant on actual notice of prior, off-campus assaults by another University student. That notice should have resulted in the University putting protective measures in place pursuant to the University's own Title IX policies to protect her from further harassment. Instead, as alleged, the University's response (or near-total lack thereof) made Plaintiff vulnerable to additional harassment on campus such as:

- The University's failure to remove Plaintiff's rapist from her classes caused her to experience further trauma and fear that prevented her from attending classes (Second Amd Compl. at ¶¶ 53, 55, 58, 99; Affidavit of Plaintiff at ¶¶ 6-9);

- The University continued to permit the nearly unfettered presence of both rapists on campus even after they were indicted for rape resulting in the severe

exacerbation of her post-traumatic stress disorder and rape trauma syndrome[5] (Second Amd Compl. at ¶ 99; Affidavit of Plaintiff at ¶ 9);

- Failing to discipline her rapists and other students for violating policies and interim measures that led to additional peer harassment including having her car vandalized on campus (Second Amd Compl. at ¶ 143; Affidavit of Plaintiff at ¶ 14);

- The University allowed the school newspaper to publish a story about Plaintiff that contained inaccurate details and caused hostility towards her on campus and online, particularly on Twitter[6] (Second Amd Compl. at ¶¶ 151-60; Affidavit of Plaintiff at ¶¶ 18-19);

- The University's lack of response caused Plaintiff's identity to be publicly revealed on social media and forced her to face peers and professors in-person who knew details of her rapes (Second Amd Compl. at ¶ 160; Affidavit of Plaintiff at ¶ 20); and

- The University permitted her rapist to participate in extracurricular activities in such a manner as to force her to withdraw from same, permitting him to further his

---

[5] It is worth noting that Plaintiff's first rape took place while she was unconscious and sleeping next to Wayman, but the second rape was a far more violent act. Tate entered the room where Plaintiff was sleeping without her consent or invitation, held her down on the bed with all of his weight, forcibly pulled her clothing down, and forced himself upon her sexually. When questioned both by police and by school officials, he denied having sexual contact of any kind with Plaintiff, a denial that was conclusively proven false by a rape kit. While the law makes no distinction between gradations of rape, it stands to reason that Tate presented an incredible level of threat not merely to Plaintiff but to other students.

[6] The campus newspaper ostensibly sought her approval, but they made clear that the article would be published with or without her participation. While they did use a pseudonym, her anonymity was not maintained for even a few hours. Despite supposedly permitting her to review the article for accuracy, she was not given any reasonable time in which to do so, and the article went to press containing inaccurate information. The furor that erupted immediately following the publication of this article caused Plaintiff substantial distress.

academic standing and career at her expense. (Second Amd Compl. at ¶ 93, 150, 165; Affidavit of Plaintiff at ¶ 17.)

The University's indifference causing Plaintiff's vulnerability to additional harassment, in turn, led to Plaintiff being unable to fully participate in the University's educational programs and activities and it undermined her "educational experience." She was diagnosed with PTSD and experienced severe anxiety anytime she was on campus. Her rapists received better treatment from Defendant than Plaintiff did. She reported both assaults and asked for accommodations pursuant to Title IX. She was first told that the only way to avoid her rapists entirely was to switch to online classes or drop out of certain classes entirely (ECF 17 ¶ 53), which literally left her in the position of having to choose to forego the educational programs and opportunities afforded by Defendant and to every other student, including her rapists, or encountering her rapists on a regular basis.[7]

The University's response was "clearly unreasonable" for a myriad of reasons:

1. The Title IX coordinator told Plaintiff that if he investigated the first rape that his investigation would imperil any criminal prosecution in a blatant effort to avoid his responsibilities under Title IX. (Second Amd Compl. at ¶ 77; Affidavit of Plaintiff at ¶ 2).

2. The University did not complete the first Title IX investigation for 347 days. (Second Amd Compl. at ¶ 181; Affidavit of Plaintiff at ¶ 3)

3. The University did not even commence the second investigation for <u>seven months</u>, and it took nearly two years to complete. (Second Amd Compl. at ¶¶ 171-75; Affidavit of Plaintiff at ¶ 4)

---

[7] Plaintiff contends that this action on the part of The University is facially discriminatory because upon reporting her sexual assault she was told that she should forego educational programs and activities.

4. The official to whom she reported asked Plaintiff "what kind of panties" she had been wearing the night of her rape along with other degrading questions; (Second Amd Compl. at ¶ 49; Affidavit of Plaintiff at ¶ 5)

5. The Title IX coordinator told her that she could either attend classes with her rapist or drop out of classes; (Second Amd Compl. at ¶ 53; Affidavit of Plaintiff at ¶ 6)

6. The University denied Plaintiff any accommodations other than a parking pass; (Second Amd Compl. at ¶ 55; Affidavit of Plaintiff at ¶ 7)

7. The University took no steps to ensure that Plaintiff and her rapist did not have classes together; (Second Amd Compl. at ¶ 58; Affidavit of Plaintiff at ¶ 8)

8. When the University finally did impose minimal restrictions on Plaintiff's rapist, well over a month later, the University failed to enforce them after being placed on notice that the respondent had violated the restrictions; (Second Amd Compl. at ¶ 99; Affidavit of Plaintiff at ¶ 9)

9. The University falsely claimed to have no legal authority to provide Plaintiff a remedy for these issues, despite clear statements to the contrary in the Tennessee Board of Regents' Policy P-80 *Discrimination and Harassment Complaint and Investigation Procedure*, which authorizes "administrative action which is appropriate" up to and including placing students on interim suspension pending the outcome of an investigation.[8] (Second Amd Compl. at ¶ 68; Affidavit of Plaintiff at ¶ 10)

---

[8] The TBR also grants its institutions authority to suspend students before a hearing where their presence poses a threat of harm, including harm to the "academic or operational processes of the institution." Presumably the ability of students to attend class is an "academic process." *Uniform Procedures fo Cases Subject to the Uniform Administrative Procedures Act*, Tennessee Board of Regents.

10. The University's Title IX coordinator told Plaintiff that even if he did investigate that he would not be able to do anything to benefit her. (Second Amd Compl. at ¶ 77; Affidavit of Plaintiff at ¶ 11)

11. Plaintiff's rapist was permitted to participate in extracurricular activities to the exclusion of Plaintiff. (Second Amd Compl. at ¶ 165; Affidavit of Plaintiff at ¶ 12)

12. The Title IX coordinator left the University months after the investigation, and the entire process began anew. (Second Amd Compl. at ¶¶ 139-41; Affidavit of Plaintiff at ¶ 13)

13. Even after the criminal indictment of Plaintiff's first rapist, the University still permitted her rapist to take classes in close proximity to Plaintiff, exposing Plaintiff to a high probability of encountering him in and around the building in which their classes were both located; (Second Amd Compl. at ¶ 143; Affidavit of Plaintiff at ¶ 14).

Defendant's failure to act exposed or made Plaintiff liable or vulnerable to the following harassment:

1. Being required to attend classes with her attacker; (Second Amd Compl. at ¶¶ 53, 58-59; Affidavit of Plaintiff at ¶ 15)

2. Being required to attend classes in close proximity to her attacker; (Second Amd Compl. at ¶ 53, 58-59, 183; Affidavit of Plaintiff at ¶ 16)

3. Being required to withdraw from or forego extracurricular activities in which her attacker was a participant in order to avoid him; (Second Amd Compl. at ¶ 93, 150, 165; Affidavit of Plaintiff at ¶ 17.)

15

4. A detailed publication of her entire ordeal in the campus newspaper; (Second Amd Compl. at ¶¶ 151-56; Affidavit of Plaintiff at ¶ 18.)

5. Being harassed online by an organized group of members of the Lambda Chi Alpha fraternity (Second Amd Compl. at ¶¶ 157-60; Affidavit of Plaintiff at ¶ 19);

6. Having her identity publicly revealed by a fellow student online and said student being subject to no disciplinary procedures despite being reported to appropriate officials (Second Amd Compl. at ¶ 160; Affidavit of Plaintiff at ¶ 20);

7. Being subjected to a barrage of hostile and vulgar comments on social media by fellow students, all of whom went undisciplined (Second Amd Compl. at ¶ 163; Affidavit of Plaintiff at ¶ 21;

8. Having her vehicle vandalized on campus (Second Amd Compl. at ¶ 112; Affidavit of Plaintiff at ¶ 22); and

9. Plaintiff suffered from PTSD and Rape Trauma Syndrome both of which were severely exacerbated by the foregoing exposure and vulnerability to harassment. (Second Amd Compl. at ¶¶ 130-32; Affidavit of Plaintiff at ¶ 23.)

> **ii. Defendants are not entitled to dismissal or summary judgment as to Plaintiff's hostile environment claim because the facts that form Plaintiff's hostile environment claim need not be limited to incidents that occurred on campus.**

The foregoing facts coupled with both Wayman and Tate's rapes of Plaintiff are sufficient for a jury to conclude that a hostile environment existed under Title IX. Again, the University's sole defense is that the rapes both occurred off campus, and, again, Defendant ignores the gravamen of Plaintiff's Second Amended Complaint. While individual incidents of off-campus rape may not be actionable as sexual harassment independently, they are certainly part of the fabric of Plaintiff's hostile environment claim. "Under this theory of liability, the plaintiff must allege

that [her] educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's' educational environment." *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)) . The question of whether a hostile environment exists turns on whether the environment was sufficient to cause a "tangible psychological injury." *Harris*, 510 U.S. at 21. A hostile environment claim has both an objective and subjective component. *Id.*

A Title IX hostile education environment claim is "governed by traditional **Title VII 'hostile environment'** jurisprudence." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (citation omitted). Neither Title VII nor Title IX require that a sexual act take place within a workplace or educational environment to create a hostile environment or have consequences at the workplace or educational environment. *Doe v. Oberweis Dairy*, 456 F.3d 704, 715 (7th Cir. 2006) ("[Under Title VII,] [t]he sexual act need not be committed in the workplace, however, to have consequences there."); *K.S. v. Detroit Pub. Schs*, 130 F. Supp. 3d 1073, 1085 (E.D. Mich. 2015) (denying summary judgment for a Title IX hostile environment claim where sexual assault by teacher on student occurred off campus).

Universities are responsible for addressing hostile environment claims on campus, even if arising or partially predicated on events that occur off-campus:

> Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

*Yeasin*, 360 P.3d at 430 (quoting Dept. of Ed., Dear Colleague Letter: Sexual Violence (Apr.l 4, 2011). This remains the standard today under the current Department of Education guidance issued in 2017. "Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 22, 2017).[9] In other words, no court to address the issue and no interpretation of the Department of Education's Office of Civil Rights in any administration has permitted funding recipients to simply ignore the on-campus collateral effects of off-campus sexual assaults.

As noted above, this is also the University's interpretation of Title IX in its own sexual misconduct policy. The University's policy "appl[ies] to incidents occurring on or off campus." (Affidavit of Plaintiff at Exh. 1 "GE2031 Sexual Misconduct and Domestic Violence Policy," p. 1. (issued September 23, 2015)). Despite this policy, which the University itself states was implemented to comply with Title IX, the University now takes the position that they 1) have no responsibility to respond to off-campus sexual assault between students. Such a position is nonsensical and in direct conflict with the stated purpose of the University's policy, which makes clear that "**[a]ny** allegation of sexual misconduct as defined herein will be investigated and adjudicated according to this policy and in compliance with Title IX. . . ." In point of fact, the University is fully aware that in order to remedy on-campus hostile environments that it is necessary to address off-campus incidents of sexual assault between students.

Plaintiff began to experience a hostile environment when Wayman raped her. In violation of its own policy the University discouraged her from pursuing the claim and disregarded the threat to her safety and psychological well-being. Due to the University's near-total indifference to

---

[9] It is worth noting that the Department of Education has maintained this standard despite the Department's decision under the current administration to revoke and replace all of the Title IX guidance issued during the previous administration.

Plaintiff's complaint, Plaintiff was repeatedly retraumatized by exposure to her rapist until she ceased attending classes, was placed in situations that required her to avoid buildings in which she had classes just to avoid encountering her rapist, was subjected to verbal harassment by fellow students, had her car vandalized on campus, had her entire story publicized in the campus newspaper in a manner that quickly resulted in the revelation of her identity, was the subject of a disparaging social media account created by Wayman's fraternity brothers, was interrogated by a school official about the panties she wore the night of her rape, was precluded from participating in academic extracurricular activities if she wanted to avoid her rapist, and, was subjected to a second rape by Tate in retaliation for reporting Wayman's crime to the police and the school. The school fostered an environment in which it was open season on Plaintiff and no consequences were meted out to anyone. There is certainly sufficient factual basis in the record for this Court to determine that a disputed issue of material fact exists sufficient for a jury to decide whether a hostile environment existed on campus.

## CONCLUSION

For the foregoing reasons, this Court should **DENY** Defendant's "Motion to Dismiss or in the Alternative for Summary Judgment," and grant Plaintiff any relief to which this Court finds she is entitled.

Respectfully submitted,

BLACK MCLAREN JONES RYLAND & GRIFFEE
A Professional Corporation

By: /s/ *Brice Moffatt Timmons*
BRICE M. TIMMONS           #29582
CHRISTOPHER M. WILLIAMS #36256
530 Oak Court Drive, Suite 360
Memphis, Tennessee 38117
(901) 762-0535 – telephone
(901) 762-0539 – facsimile
btimmons@blackmclaw.com
cwilliams@blackmclaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April, 2019, a true and correct copy of the foregoing has been served via the Court's electronic filing system upon the following:

David M. Rudolph
Assistant Attorney General
40 South Main Street, Suite 1014
Memphis, Tennessee 38103

Robert W. Wilson
Assistant Attorney General
40 South Main Street, Suite 1014
Memphis, Tennessee 38103

Matthew D. Janssen
Attorney General of the State of Tennessee
425 Fifth Avenue North, 2nd Floor
Nashville, Tennessee 37243

/s/ *Brice Moffatt Timmons*