**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

JANE DOE,

      Plaintiff,

v.                                                                Case No. 2:18-cv-2032-MSN-cgc

THE UNIVERSITY OF MEMPHIS,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR, IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendant University of Memphis' ("Defendant" or "University") Motion to Dismiss or, in the Alternative, Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56 filed March 19, 2019. (ECF No. 46.)  Defendant submitted a statement of material facts, an affidavit, and other documents in support of its motion. The Court finds consideration of these documents unnecessary at this juncture and does not consider them in making its decision.  Accordingly, the Court evaluates Defendant's motion as a motion to dismiss under Rule 12(b)(6).  For the reasons set forth below, Defendant's motion is **DENIED**.

## BACKGROUND

This is an action against the University of Memphis for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"). Plaintiff, a student at the University, alleges she was raped twice off campus by two different fellow University students over the course of three weeks.  She timely reported both alleged assaults to the University.  She alleges that she was subject to harassment and retaliation on campus in the weeks and months

subsequent to the alleged off-campus assaults.  Defendant asserts it does not have any liability under Title IX because the alleged assaults occurred off campus.

## A.      Procedural

On January 11, 2018, Plaintiff filed her initial complaint against Defendant alleging violations of Title IX and state law claims.  (ECF No. 1.)  On March 5, 2018, Defendant filed its first motion to dismiss.  (ECF No. 14.)  Thereafter, on March 21, 2018, Plaintiff filed an amended complaint, which maintained her Title IX claims while removing her state law claims. (ECF No. 17.)  As a result of the filing of the amended complaint, the Court denied Defendant's first motion to dismiss as moot.  (ECF No. 48.)   On April 9, 2018, Defendant filed its second motion to dismiss. (ECF No. 19.) On February 6, 2019, Defendant filed a motion for summary judgment. (ECF No. 31.) On March 15, 2019, Plaintiff moved to amend her complaint for a second time, which this Court granted on March 18, 2019.  (ECF Nos. 43 & 44.)  On March 19, 2019, Plaintiff filed her Second Amended Complaint. (ECF No. 45.)  As a result of the Second Amended Complaint, the Court denied as moot Defendant's second motion to dismiss and its motion for summary judgment. (ECF No. 48.)  Thereafter, Defendant filed its Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  (ECF No. 46.)  The Court heard oral arguments on Defendant's motion on July 2, 2019.  (ECF No. 66.)

## B.      Factual

According to the Second Amended Complaint, in the spring of 2017, Plaintiff was a junior at the University.  (ECF No. 45 at PageID 357.)  At the beginning of the spring 2017 semester, Plaintiff had a 3.8 GPA, routinely made the Dean's List, and was involved in numerous community activities.  (*Id.*)  Plaintiff also worked for Defendant's annual giving department.  (*Id.* at PageID 358.)  Following the events alleged below, Plaintiff's grades dropped; she was diagnosed with

posttraumatic stress disorder and rape trauma syndrome; and she withdrew from extracurricular activities. (*Id.* at PageID 369, 374–79.)

On April 1, 2017, Plaintiff attended a party at the Sigma Chi fraternity house on Defendant's campus. (*Id.* at PageID 358.) At the party, Plaintiff consumed alcohol and "small quantities" of drugs. (*Id.*) Plaintiff left the party believing she was "mildly intoxicated," but shortly thereafter she began to experience "extreme confusion" and "inability to focus," which caused her to believe that she could not get herself home. (*Id.*) Plaintiff contacted a fellow student, Nicholas Wayman ("Mr. Wayman"). (*Id.* at PageID 360.) Plaintiff told Mr. Wayman that she believed she had been drugged, and she asked if he would drive her home. (*Id.*) Mr. Wayman picked Plaintiff up, but instead of taking her home, he drove Plaintiff to his family's house in Arlington, Tennessee. (*Id.*)

Once at Mr. Wayman's family's house, Plaintiff fell asleep in Mr. Wayman's bedroom. (*Id.*) Mr. Wayman began touching Plaintiff in a sexual fashion, and Plaintiff responded by telling Mr. Wayman that she was too intoxicated and did not want to engage in sexual activity. (*Id.*) Plaintiff has a vague memory of Mr. Wayman calling her name but being unable to respond, and Plaintiff subsequently fell unconscious. (*Id.*) When Plaintiff awoke the next morning, she was naked from the waist down, and she believed she had been sexually assaulted based on the feeling in her genital area. (*Id.*) Plaintiff asked Mr. Wayman to drive her to her vehicle, and she promptly went to the emergency department at St. Francis hospital where a "rape kit" was performed. (*Id.* at PageID 360–61.)

The following Monday, April 3, 2017, Plaintiff reported the alleged assault to Defendant's Office of Institutional Equity ("OIE"). (*Id.* at PageID 361.) Plaintiff spoke to Darron Wibberding ("Mr. Wibberding") at the University when making her initial report. (*Id.*) Plaintiff alleges that

Mr. Wibberding asked her what kind of panties she had been wearing the night the alleged assault occurred "along with other degrading questions that implied that Plaintiff was responsible for her own rape." (*Id.*)  Plaintiff also alleges Mr. Wibberding asked for photographs of her outfit and for other "irrelevant details." (*Id.*)  Mr. Wibberding ultimately referred Plaintiff to Defendant's Title IX Coordinator, Michael Washington ("Mr. Washington"). (*Id.*)

Plaintiff informed OIE that she had multiple classes with Mr. Wayman. (*Id.*)  She alleges Mr. Washington's response was to discourage her from pursing a claim for a violation of the school's sexual misconduct policy and telling her that Mr. Wayman had a due process right to attend classes for which he had paid. (*Id.*)  Defendant put a "no contact" directive in place, but Mr. Wayman was not removed from the classes he had with Plaintiff. (*Id.* at PageID 362–64.)  Mr. Washington informed Plaintiff that she could withdraw from those classes or take online classes for the remaining weeks of the semester if she wished. (*Id.*)  Defendant provided Plaintiff with a parking pass for an on-campus garage so she would not have to use the general parking lots. (*Id.* at PageID 362.)  Defendant denied Plaintiff's request that Mr. Wayman be given an interim suspension. (*Id.*)

On April 21, 2017, approximately three-weeks after the alleged assault by Mr. Wayman, Plaintiff and a friend attended an off-campus charity party sponsored by Defendant's Lambda Chi Alpha fraternity. (*Id.* at PageID 366.)  At the party, Plaintiff met another student, T.J. Tate ("Mr. Tate"). (*Id.* at PageID 367.)  During the party, Mr. Tate made comments to Plaintiff about Mr. Wayman's alleged assault that were sympathetic to Plaintiff and supportive of her position. (*Id.*)

Later, Plaintiff became agitated and uncomfortable and wanted to leave the party. (*Id.*)  Plaintiff's friend asked Mr. Tate to walk them to her apartment at The Gather on Southern ("The Gather"), where Plaintiff was staying with the friend. (*Id.*)  As they were walking to The Gather,

Plaintiff's friend stopped and decided to stay at her boyfriend's house, which was on the way.  (*Id.*)
Mr. Tate continued to accompany Plaintiff the remaining way to The Gather.  (*Id.*)  Once at the
friend's apartment at The Gather, Mr. Tate asked Plaintiff if he could sleep on the sofa so that he
did not have to drive home after drinking, to which Plaintiff agreed.  (*Id.*)  Plaintiff then went into
the bedroom, shut the door, put on her sleeping clothes, and went to sleep while Mr. Tate remained
on the sofa watching television.  (*Id.*)

Sometime later, Mr. Tate entered the bedroom, got onto the bed, and asked Plaintiff,
"Wanna f__k."  (*Id.*)  Mr. Tate then allegedly forcibly turned Plaintiff over, removed her shorts,
held her down, and raped her.  (*Id.* at PageID 368.)  Immediately following the alleged assault,
Plaintiff dressed herself and fled the apartment to her car where she locked herself inside and texted
two friends.  (*Id.*)  Plaintiff's friends then arrived at the apartment and contacted security at The
Gather who in turn contacted the police.  (*Id.*)  Plaintiff reported the assault to Defendant's campus
police and then the Memphis Police Department and a "rape kit" was administered.  (*Id.*)  The
campus police advised Defendant that Plaintiff had reported a sexual assault by a fellow student.
(*Id.*)

A few days after this second alleged assault, on April 25, 2017, Plaintiff was selected to
participate in the "LeaderShape" program, which was "a valuable extracurricular opportunity."
(*Id.* at PageID 369.)  However, Plaintiff removed herself from the program because Mr. Wayman
was also selected.  (*Id.*)

On April 26, 2017, H. Phuong Nguyen ("Ms. Nguyen") with Defendant's OIE contacted
Plaintiff, told her that OIE would need to open a new investigation, and she scheduled Plaintiff to
meet to make her complaint against Mr. Tate on May 1, 2017.  (*Id.*)  After Plaintiff made her
complaint, Mr. Tate did not respond within Defendant's five-day notice period.  (*Id.* at PageID

369–70.)  A second notice was sent to Mr. Tate, and he was interviewed a little more than a week later.  (*Id.*)

On May 10, 2017, Plaintiff advised OIE that Mr. Wayman had engaged in campus events in violation of the interim measures related to him, and she provided OIE with supporting photographs and social media posts.  (*Id.* at PageID 370.) Similarly, on May 17, 2017, Plaintiff observed Mr. Wayman on campus participating in activities in violation of the interim measures and reported the same to OIE.  (*Id.*)

On May 20, 2017, Plaintiff advised OIE that Mr. Wayman would be prosecuted for the alleged sexual assault.  (*Id.* at PageID 371.)  A decision about whether Mr. Tate would be prosecuted would not be made until the results of the rape kit were returned, which could take up to ten months.  (*Id.* at PageID 371.)  Plaintiff also advised OIE that her car had recently been vandalized, and that she believed it could have been done by fraternity brothers of Mr. Wayman. (*Id.* at PageID 372.)  It is not clear whether this vandalism incident occurred on or off campus.[1] (*Id.*)

During this time period, there was back-and-forth communication between Plaintiff and OIE about whether Plaintiff wanted OIE to hold the investigations of Mr. Wayman and Mr. Tate in abeyance pending the outcome of the criminal investigations and prosecutions.  (*Id.* at PageID 371–72.)  However, on June 1, 2017, Plaintiff advised OIE that she wanted the investigations to proceed.  (*Id.* at PageID 373.)  That same day, OIE told Plaintiff it had determined that Mr. Wayman had violated the interim measures it put in place.  (*Id.*)  As a result, even though Mr.

---

[1] Plaintiff's car was vandalized a second time in January 2018 when she was parked on campus.  (ECF No. 45 at PageID 372.)

Wayman was not enrolled in summer classes, he was suspended until August 27, 2017, the first day of classes for the fall 2017 term. (*Id.*)

The next day, June 2, 2017, Plaintiff contacted Defendant, asking the school to "make certain" that Mr. Wayman and Mr. Tate couldn't be near her on campus. (*Id.*) In response, Ms. Nguyen emailed Plaintiff that the only option available to regulate Mr. Wayman's or Mr. Tate's contact with her was through a no contact directive and asking if she would like OIE to issue one. (*Id.*) Ms. Nguyen further advised that "[a]s far as the class schedule, that would not be possible as it would violate FERPA law. As an alternative, we can always make arrangements with your professors should you prefer to limit your need to come on campus . . . .[2]" (*Id.*)

On August 3, 2017, Mr. Wayman was indicted on charges of rape and sexual battery. (*Id.* at PageID 375.) A warrant was issued for his arrest on August 7, 2017, and he was arrested that same day. (*Id.*)

On August 9, 2017, Melanie Murry ("Ms. Murry"), General Counsel for Defendant, emailed Plaintiff to request a copy of Plaintiff's fall schedule "to make sure that [Plaintiff was not] in any classes with" Mr. Wayman or Mr. Tate. (*Id.*) In her email, Ms. Murry also advised that "the Office of Institutional Equity is in transition as Michael Washington has recently left the office and a new director should be starting before the end of this month." (*Id.*)

Kenneth Anderson ("Mr. Anderson") became Defendant's new Title IX coordinator. (*Id.* at PageID 376.) On August 25, 2017, Mr. Anderson emailed Plaintiff informing her that Mr. Wayman was registered for a class in the same building and at the same time as one of her classes, but that Defendant was "unable to move the classes under such late notice." (*Id.*) Mr. Anderson

---

[2] It is not clear from the Second Amended Complaint whether this was in response to a specific question or request by Plaintiff or her general request that Mr. Wayman and Mr. Tate not be allowed to be near her on campus.

advised Plaintiff that Mr. Wayman had been directed to enter and exit the building only through a specified door so that Plaintiff could use a different entrance and be able to avoid Mr. Wayman. (*Id.*)

On September 1, 2017, Plaintiff contacted Mr. Anderson to request additional support services and interim measures. (*Id.* at PageID 377.) On September 5, 2017, Mr. Anderson responded "confirming" Plaintiff's request. (*Id.*)

During the week of October 2, 2017, a student reporter for the Daily Helmsman, Defendant's school newspaper, contacted Plaintiff for comment on a story about her alleged assaults that he intended to publish. (*Id.*) Plaintiff believed the article would be limited in scope and would not contain enough information to identify her. (*Id.*) The article was published October 10, 2017 with the headline "Student Raped Twice in 20 Days: Alleged Assailants Remain U of M Students." (*Id.* at PageID 378.) Plaintiff alleges that she was mislead regarding the content of the article. (*Id.* at PageID 377–78.) The article used a pseudonym, but contained specific details about both alleged assaults and Defendant's response. (*Id.*)

On October 12, 2017, two days after publication of the article, a Twitter account was created entitled "Free Nick Wayman" using the handle "@hoesbelyin_." (*Id.* at PageID 378.) Plaintiff alleges that the Twitter handle was used to harass her and to make "disparaging and hostile claims" about her. (*Id.*) The next day, a University student revealed Plaintiff's actual identity to the University community. (*Id.*) Plaintiff contacted OIE about the student's revelation and that "she was suffering ongoing harassment as a result." (*Id.* at PageID 379.) Plaintiff alleges that during the fall 2017 semester fellow students continued "to post hostile comments on social media, to disparage her, and to call her a liar." (*Id.*)

On October 18, 2017, Plaintiff met with OIE, at which time OIE advised Plaintiff there had been a "'misunderstanding' that resulted in the investigation of her cases being 'held in abeyance.'" (*Id.* at PageID 380.)  OIE conducted an interview with Plaintiff regarding the alleged assault by Mr. Tate that same day, but informed Plaintiff there was no basis on which they could issue an interim suspension for Mr. Tate.  (*Id.* at PageID 380–81.)  Following the filing of Plaintiff's initial complaint herein on January 11, 2018, Defendant issued an interim suspension for Mr. Tate pending the outcome of its investigation. (*Id.* at PageID 381.)

On March 15, 2018, Defendant issued its report on its investigation into the alleged assault by Mr. Wayman.  (*Id.* at PageID 382.)  On April 27, 2018, Mr. Wayman was suspended from the University.  (*Id.*)  On December 14, 2018, Defendant issued its report on its investigation of the alleged assault by Mr. Tate.  (*Id.* at PageID 383.)

## STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  Using this framework, the court determines whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  A complaint need not contain detailed factual allegations; however, a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).   In other words, the "[f]actual allegations must be enough to raise a right to relief above [a] speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).   If a court decides in light of its judicial experience and common sense, that the claim is not plausible, the case may be dismissed at the pleading stage. *Iqbal*, 556 U.S. at 679.   "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."   *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556.

## DISCUSSION

Amidst many developments under Title IX is an increasing number of cases testing the limits of liability for sexual discrimination due to harassment in the form, or aftermath, of sexual violence.[3]  This includes peer-on-peer sexual assault while enrolled in school. Sexual assault is a sort of cancer in any community.  In its aftermath, the side effects remain to be addressed by the courts. Whether a survivor of sexual assault may recover from a college or university under Title IX often turns on specific facts which inevitably vary with each case. Differing facts are as numerous as the human condition is fickle and flawed, and it is not easy to categorize them to yield consistent application of the law. In any event, it is essential that the rights of the individuals and

---

[3] Existing regulations under Title IX were promulgated in 1975 before the federal courts addressed sexual harassment as a form of sex discrimination. Since then, a number of guidance documents have been issued by the Department of Education; some, in the form of "Dear Colleague Letters," have been withdrawn.  The resulting uncertainty and a proliferation of cases and opinions creates additional complexity in an already nuanced area of law. The proposed promulgation of revised regulations currently underway by the Department of Education is evidence of the underlying challenge. While it is unclear what form the final regulations may ultimately take, the mandate that "an institution that receives federal funding must ensure that no student suffers deprivation of her or his access to educational opportunities on the basis of sex" is clear, even though it must all too often be tested in the context of sexual violence and its aftermath. Office for Civil Rights, United States Department of Education, *Q&A on Campus Sexual Misconduct* (September 2017).

institutions implicated or involved be adequately recognized and upheld. Respect for their reputation, dignity, and the rule of law requires nothing less.

Here, Plaintiff proceeds under two theories of Title IX liability: (1) deliberate indifference, and (2) hostile environment.  In its Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, Defendant asserts it has no Title IX liability because the alleged assaults occurred off campus.

Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). In *Gebser v. Lago Vista Independent School District*, the Supreme Court found that institutional liability under Title IX exists in instances of known sexual harassment of a student by faculty or employees of the federally funded institution when the school is "deliberately indifferent" to the harassment.  524 U.S. 274, 292 (1998).  A year later, the Court extended the reasoning of *Gebser* to known student-on-student sexual harassment.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 653–54 (1999).  To establish a *prima facie* case of student-on-student sexual harassment, the plaintiff must demonstrate the following elements: (1) sexual harassment so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment. *Id.* at 650; *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444–45 (6th Cir. 2009).

An institution is deliberately indifferent "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

Title IX does not require that an institution "remedy" peer harassment, but simply that it "respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.

The Supreme Court also made clear in *Davis* that Title IX liability is limited to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. In other words, "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. Further, "the deliberate indifference must, at a minimum 'cause [the plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it." *Id.* at 644–45 (citations omitted).

A hostile environment claim under Title IX "is analogous to a Title VII hostile environment claim." *Doe v. Miami University*, 882 F.3d 579, 590 (6th Cir. 2018) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 515 (6th Cir. 1996)). Under a hostile environment theory of liability, the plaintiff must allege that her education experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (alteration in original).

As to the allegations at issue, Defendant argues that it has no liability whatsoever for sexual assaults that occur off campus. Defendant's motion does not address Plaintiff's allegations concerning events occurring on campus subsequent to the alleged assaults, and Defendant attempts to disclaim all responsibility by drawing a bright-line:

> This threshold motion to dismiss . . . focuses exclusively on the ***off-campus location and context*** of the two alleged sexual assaults. The University does not have a legal duty under Title IX to address off-campus assaults in private settings involving its students. For liability to attach, the alleged off-campus assault must occur within an "education program or activity" operated by the University. Under Title IX and applicable case law, Plaintiff cannot demonstrate that the University had substantial control over the context of the alleged off-campus sexual assaults of Plaintiff that occurred at a private residence and private apartment complex

respectively and did not involve an education program or activity operated by the University. As a result, the Court should dismiss Plaintiff's claims or, in the alternative, grant summary judgment in the University's favor.

(ECF No. 46 at PageID 389 (emphasis in original).)

However, Plaintiff contends that she has not sued for the off-campus assaults but for Defendant's deliberate indifference and the hostile environment on campus after the assaults:

This defense is wide of the mark in that Plaintiff has not sued Defendant for her rapes. She has sued Defendant for its deliberate indifference to her harassment and liability to harassment following those rapes, and for fostering a hostile environment on campus that resulted from both the rapes themselves and her reports of the rapes to the police and the University.

(ECF No. 60 at PageID 461.)

This Court has reviewed the authorities cited by Defendant and finds no controlling authority for the blanket application of the bright-line rule for which it advocates.[4]

The Court recognizes that there have been several cases in the Eighth Circuit, *Roe v. St. Louis University*, 746 F.3d 874 (8th Cir. 2014), and *Ostrander v. Duggan*, 341 F.3d 745 (8th Cir. 2003), involving off-campus sexual assaults where the court found the institutional defendants did not have liability under Title IX.  However, a close reading of each of these cases reveals that the off-campus aspect of the assaults was not the deciding factor.  Instead, in *Roe* the court determined that the school had not been deliberately indifferent.  *Roe*, 746 F.3d at 884–87. In *Ostrander*, the court determined that (1) the school lacked actual knowledge of the complaints of sexual assault brought by female students against the fraternity members, and (2) that the school's response to the plaintiff's allegations was not deliberately indifferent.  *Ostrander*, 341 F.3d at 750–51.

---

[4] Department of Education Guidance provides that "[s]chools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." Office for Civil Rights, United States Department of Education, *Q&A on Campus Sexual Misconduct* (September 2017).

Defendant also cites *Samuelson v. Oregon State University*, decided by the District Court of Oregon.  162 F. Supp. 3d 1123 (D. Or. 2016).  *Samuelson*, however, is distinguishable because the alleged sexual assault was not committed by an Oregon State University student, and it is not clear whether there were allegations of continuing on-campus ramifications or harassment as there are here.  *Id.* at 1125–27.

Further, this Court notes that in *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, a case dealing with off-campus harassment, the Tenth Circuit Court of Appeals went out of its way to note that it was *not* suggesting that "harassment occurring off school grounds cannot as a matter of law create liability under Title IX." 511 F.3d 1114, 1122 n.1 (10th Cir. 2008).

Additionally, Kansas State University has on several occasions advocated for the same position that Defendant would have this Court adopt regarding off-campus assaults.  In *Weckhorst v. Kansas State University*, the District of Kansas Court specifically declined to adopt such a position stating, "such a bright-line rule is foreclosed by *Rost*."  241 F. Supp. 3d 1154, 1168 (D. Kan. 2017); *see also Farmer v. Kansas State Univ.,* Case No. 16-cv-2256, 2017 WL 978116 (D. Kan. Mar. 13, 2017).

Applying the principles from *Gebser* and *Davis* to Plaintiff's allegations, the Court concludes that she has sufficiently pleaded a cause of action under Title IX as to both theories— deliberate indifference and hostile environment.  Specifically, Plaintiff's Second Amended Complaint provides detailed factual allegations of harassment occurring in contexts that Defendant appears to control, even though the alleged sexual assaults did not ultimately occur in a context within Defendant's control.  Although the off-campus context has never been directly addressed as a threshold issue in this Circuit, allowing Plaintiff to move forward at this stage of the litigation is consistent with the holdings of other district courts addressing cases involving allegations of off-

campus assaults.  *See Doe v. University of Tennessee*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016);

*Butters v. James Madison University*, 145 F. Supp. 3d 610 (W.D. Va. 2015).

<u>**CONCLUSION**</u>

For the reasons set forth above, this Court finds that Plaintiff's Second Amended

Complaint states a plausible claim for relief.  Accordingly, Defendant's Motion to Dismiss or, in

the Alternative, Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED**, this 27th day of November, 2019.


   *s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE